UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

In re:

**4218 PARTNERS LLC**

                                Debtor.

-----------------------------------------------------------X

**4218 PARTNERS LLC,**
                    Plaintiff

-against-

**MAGUIRE FT. HAMILTON LLC,**
                      Defendant

-----------------------------------------------------------X

Chapter 11

Case No:  19-44444 (NHL)

Adversary Proceeding
No. 19-01115 (NHL)

## MEMORANDUM OF LAW IN OPPOSITION TO DEBTOR'S MOTION TO DISQUALIFY ROBINSON BROG FROM REPRESENTING MAGUIRE FT. HAMILTON LLC

ROBINSON BROG LEINWAND GREENE
GENOVESE & GLUCK P.C.
875 Third Avenue, 9th Floor
New York, New York 10022
Tel: (212) 603-6300

*Attorneys for Defendant Maguire Ft. Hamilton LLC*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................ 2

ARGUMENT ................................................................................................................ 10

    I.      LEGAL STANDARD FOR DISQUALIFICATION MOTIONS. ............................ 10

    II.    THE MOTION MUST BE DENIED BECAUSE THE FIRM DID NOT VIOLATE THE PROSPECTIVE CLIENT RULE. .................................................................... 12

    III.   DEBTOR CANNOT SATISFY THE SECOND CIRCUIT STANDARD FOR DISQUALIFICATION OF COUNSEL UPON WHICH IT RELIES. ....................... 22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ADP, Inc. v. PMJ Enters., LLC*,
    2007 U.S. Dist. LEXIS 17808 (D.N.J. Mar. 14, 2007)...........................................................18

*Bacote v. Riverbay Corp.*,
    2017 WL 945103 (S.D.N.Y. Mar. 10, 2017) ...........................................................................10

*Bd. of Educ. v. Nyquist*,
    590 F.2d 1241 (2d Cir. 1979).................................................................................................11

*Bell v. Cumberland Cty.*,
    No. 09 CV 6485, 2012 WL 1900570 (D.N.J. May 23, 2012).................................................17

*Benevida Foods, LLC v. Advance Magazine Publishers Inc.*,
    No. 15 CV 2729, 2016 WL 3453342 (S.D.N.Y. June 15, 2016)............................................17

*Bernacki v. Bernacki*,
    47 Misc. 3d 316 (Sup. Ct. Monroe Cnty. 2015) .....................................................................13

*Brown & Williamson Tobacco Corp. v. Pataki*,
    152 F. Supp. 2d 276 (S.D.N.Y. 2001).....................................................................................21

*Coan v. Dunne*,
    2019 U.S. Dist. LEXIS 10368 (D. Conn. Jan. 22, 2019).......................................................13

*In re Corwin Place, LLC*,
    562 B.R. 663 (Bankr. N.D. W. Va. 2016)...............................................................................17

*Evans v. Artek Sys. Corp.*,
    715 F.2d 788 (2d Cir. 1983)........................................................................................22, 24, 26

*In re Faller*,
    2014 WL 3385364 (Bankr. W.D. Ky. 2014) ..........................................................................17

*First NBC Bank v. Murex, LLC*,
    2017 U.S. Dist. LEXIS 64727 (S.D.N.Y. Apr. 28, 2017).......................................................12

*Gustafson v. Dippert*,
    68 A.D.3d 1678 (4th Dep't 2009)...........................................................................................14

*Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*,
    409 F.3d 127 (2d Cir. 2005)....................................................................................................10

*Interpetrol Bermuda, Ld. v. Rosenwasser*,
    1988 U.S. Dist. Lexis 14307 (S.D.N.Y. Dec. 19, 1988).........................................................14

*Lamborn v. Ditter*,
    873 F.2d 522 (2d Cir. 1989).............................................................................11

*Lankler, Siffert & Wohl LLP v. Rossi*,
    125 Fed. Appx. 371 (2d Cir. 2005)...................................................................10

*Mayers v. Stone Castle Partners, LLC*,
    126 A.D.3d 1 (1st Dep't 2015) ....................................................................13, 17

*Med. Diagnostic Imaging PLLC v. CareCore Nat'l LLC*,
    542 F. Supp. 2d 296 (S.D.N.Y. 2008)..........................................................23, 24

*Muriel Siebert & Co., Inc. v. Intuit Inc.*,
    32 A.D.3d 284 (1st Dep't 2006) .......................................................................11

*O Builders & Assocs., Inc. v. Yuna Corp. of N.J.*,
    19 A.3d 966 (N.J. 2011)....................................................................................13

*Pellegrino v. Oppenheimer & Co.*,
    49 A.D.3d 94 (1st Dep't 2008) ....................................................................19, 20

*Pizzarotti, LLC v. FPG Maiden Lane, LLC*,
    2019 N.Y. Misc. LEXIS 4841 (Sup. Ct. N.Y. Cnty. Sept. 3, 2019) .................13

*Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc.*,
    687 F. Supp. 2d 381 (S.D.N.Y. 2010)...............................................................11

*Sullivan v. Cangelosi*,
    84 A.D.3d 1486 (3d Dep't 2011) ......................................................................14

*Twin Labs., Inc. v. Weider Health & Fitness*,
    No. 87 CV 0949, 1989 WL 49368 (S.D.N.Y. May 4, 1989)..............................11

*United States Football League v. N.F.L.*,
    605 F. Supp. 1448 (S.D.N.Y. 1985)..................................................................11

*United States v. Hammad*,
    858 F.2d 834 (2d Cir. 1988)..............................................................................10

*United States v. Prevezon Holdings Ltd.*,
    839 F.3d 227 (2d Cir. 2016)...........................................................22, 23, 24, 25

*Universal City Studios, Inc. v. Reimerdes*,
    98 F. Supp. 2d 449 (S.D.N.Y. 2000).................................................................21

*Wertheimer v. Cohen*,
    1991 U.S. Dist. LEXIS 5273 (S.D.N.Y. Apr. 22, 1991).....................................11

*In re WorldCom, Inc.*,
    311 B.R. 151 (Bankr. S.D.N.Y. 2004) ...................................................................................21

*Xiao Hong Liu v. VMC East Coast LLC*,
    2017 WL 4564744 (E.D.N.Y. Oct. 11, 2017) ........................................................................17

**Statutes**

Conn. R. Prof. Cond. R. 1.18 ..........................................................................................................14

N.Y. R. Prof. Cond. R. 1.6 ......................................................................................................13, 17

N.Y. R. Prof. Cond. R. 1.9 ..............................................................................................................12

N.Y. R. Prof. Cond. R. 1.18 ..........................................................................................1, 12, 13, 18

**Other Authorities**

N.Y. St. Bar Ass'n Comm. on Prof. Ethics Op. 960 (2013) ..........................................................13

Restatement of Agency § 6.03 .........................................................................................................20

Restatement 2d, Contracts § 317(2) ................................................................................................20

Robinson Brog Leinwand Greene Genovese & Gluck P.C. ("Robinson Brog" or the "Firm"), counsel to defendant Maguire Ft. Hamilton LLC ("Maguire" or "Lender"), in the above-captioned bankruptcy case (the "Case") and adversary proceeding (the "Adversary Proceeding"), hereby submits this Memorandum of Law, together with the accompanying Declaration of Fred B. Ringel, dated February 21, 2020 ("Ringel Decl."), and exhibits thereto, in opposition to the motion of 4218 Partners LLC ("4218" or "Debtor") to disqualify Robinson Brog from continuing to act as counsel to Maguire (the "Motion" or "Mot."). For the foregoing reasons, the Motion is without merit and should be denied in its entirety.

## PRELIMINARY STATEMENT

The Motion should be denied because it is nothing more than a transparent tactical effort to prejudice the defense of Maguire by replacing Maguire's attorneys, who have diligently and zealously objected to Debtor's claims, with a more pliable attorney Debtor believes will allow it to achieve a more favorable result. Although it is unclear what Rules of the New York Rules of Professional Conduct Debtor argues that Robinson Brog violated, Debtor claims the Firm's preliminary consultation with Samuel (a/k/a "Shabsi") Pfeiffer ("Pfeiffer"), who is not Debtor and has no membership or controlling interest in Debtor, precludes the Firm from representing Maguire against Debtor. The Motion is meritless because under the governing prospective client rule (Rule 1.18(c) of the New York Rules of Professional Conduct), neither Pfeiffer nor 4218 nor anyone has proven that the Firm received confidential information, much less that any allegedly confidential information the Firm received could be significantly harmful to Debtor's claims against Maguire.

During a preliminary consultation with Pfeiffer, Robinson Brog explained what information it would need for a potential bankruptcy filing and discussed the amount required for

a retainer.  It did not discuss legal strategy and it did not receive any information that could possibly constitute a confidence.  Pfeiffer only conveyed publicly-known background information to Robinson Brog and his counsel, Mordy Flam advised he was going to attempt to seek to injunctive relief in state court to protect Pfeiffer's membership interests that were purportedly at risk of being sold. Any strategy to stop the sale which was allegedly delivered in confidence was made public when the state court action was filed and a temporary restraining order was denied. Ultimately, when Pfeiffer did not provide the requested information needed to evaluate a potential representation or pay the required retainer, the Firm declined to act as Pfeiffer's attorneys.  In other words, Pfeiffer was nothing more than a prospective client and, under that standard, absent a showing that he disclosed confidential information that was "significantly harmful" to Debtor, the Firm was not precluded from representing Maguire. Moreover, even under the incorrect standard cited in the Motion neither Debtor nor Pfeiffer were the Firm's former client, Robinson Brog's consultation has no substantial relation to any of the issues before the Court in this Adversary Proceeding, and no confidences were disclosed.  The Firm was free to undertake its representation of Maguire.  The Motion should be denied.

STATEMENT OF FACTS

Debtor's highly misleading and vague declarations must be corrected and, where necessary, placed in context in order to reveal the true tactical nature of the Motion.

**A.      The Firm Was Not Retained on June 25, 2019**

On Tuesday, June 25, 2019, Fred Ringel was conducting a bench trial in the Bankruptcy Court for the Southern District of New York when he received an email from Pfeiffer, at 8:51 a.m., asking whether Mr. Ringel was available to talk because Pfeiffer had a bankruptcy question.  (Ringel Decl. ¶ 4 Ex. A.)  Neither the Firm nor Mr. Ringel had ever represented

Pfeiffer in any capacity before this communication.[1]  (*Id.*)  Mr. Ringel informed Pfeiffer he could not talk because he was too busy with the trial and that the earliest he could speak to him would be on Thursday.  (Ringel Decl. ¶ 5.)  Arrangements were made to speak that night and, according to Mr. Ringel's mobile phone billing records, Pfeiffer and Mordy Flam ("Flam"), who represented to Mr. Ringel he was Pfeiffer's attorney, and Mr. Ringel had a twenty-six-minute call, starting at 8:16 p.m.  (*Id.*)

The "bankruptcy question" Pfeiffer raised was about Mr. Ringel possibly representing him – not any entity – regarding a potential filing of a bankruptcy to protect *his* membership interests in an entity he claimed he owned.  (Ringel Decl. ¶ 6.)  Pfeiffer told Mr. Ringel that he had pledged his equity interests that he held personally to secure a loan from a lender (he did not disclose the name of the lender or the amount of the loan).   Pfeiffer further stated that he had already agreed to transfer the membership interests, which the lender was attempting to sell in a public sale, to an unidentified entity.  At no time did Pfeiffer mention the name of the transferee, which the Firm since learned was 175 Pulaski RLM LLC ("Pulaski"), an entity which is also a debtor in this court.  Pfeiffer did not provide any information about the property which was the asset in which he held the membership interest.

When Pfeiffer mentioned a transfer of the membership interests and that there were multiple entities involved, Mr. Ringel realized there were complexities as to which entity needed to file for bankruptcy, whether Pfeiffer still controlled the entity, and, therefore, whether Mr. Ringel was even talking to the right person (i.e., someone with authority to act).  (*Id.*)  Mr. Ringel told Pfeiffer (and Flam) that (i) the scheduled sale of the membership interests could be

---

[1]        Oddly, Debtor attempts to create the appearance of an ongoing attorney-client relationship with the Firm and Mr. Ringel by stating that Mssrs. Pfeiffer and Flam sought "bankruptcy advice" from the Firm "with whom they had previously interacted in another bankruptcy case."  (Mot. ¶ 13.)  Sharing a professional acquaintance does not create a pre-existing attorney-client relationship and it is difficult to understand why Debtor points out an undefined "interaction" in a totally unrelated bankruptcy case except to mislead the Court into thinking a relationship existed.

stopped with a bankruptcy, but (ii) Mr. Ringel would not be able to know, without reviewing the critical documents, which entity or entities would have to file a bankruptcy petition to obtain a stay of the sale or whether Pfeiffer himself would personally have to file to stop the sale.  (Ringel Decl. ¶ 7.)   However, Mr. Ringel made clear every step of the way that until he had been retained, received the information and reviewed it, and received good funds, he could not advise Pfeiffer.  (*Id.*)

During the call, Mr. Ringel also requested a standard set of documents that he always requires to evaluate and file a bankruptcy petition:  the organizational documents for the filing entity, including the operating agreement, the entity's mailing address, location of its principal assets, its tax ID, the name and title of the authorized signatory, a list of creditors with each creditor's address and amount owed, an estimate of the amount of Debtor's assets and liabilities, a thirty-day budget, whether the entity had previously filed bankruptcy and if so, the jurisdiction and case number and a brief description of what the entity does, and why it is filing.  (Ringel Decl. ¶ 8.)  He explained that this information was needed for every entity if more than one was filed.  (*Id.*)

Near the conclusion of the call, Mr. Ringel quoted Pfeiffer a retainer amount of $35,000 for each entity that would be filing a chapter 11 proceeding.  (Ringel Decl. ¶ 9.)   Pfeiffer attempted to negotiate a lower amount, which Mr. Ringel rejected.   (*Id.*)  Mr. Ringel reiterated to Pfeiffer that before the Firm could provide him with any legal advice or act as bankruptcy counsel, Pfeiffer would need to execute an engagement letter, provide documents to Mr. Ringel and time for him to review them to understand the situation and to pay a retainer.  (*Id.*)  This discussion took up the entire twenty-six minute call.  (Ringel Decl. ¶ 10.)   Notably, Flam interjected during Pfeiffer's attempt to negotiate a reduced fee that the Firm need not decide the

retainer amount at that time because he was preparing an application for a temporary restraining order ("TRO") to stop the sale and the Firm would only need to act as bankruptcy counsel if the TRO application failed.  (Ringel Decl. ¶ 11.)  It was clear then that the Firm was not being retained at that time.  (*Id.*)

**B.          The Immediate Response to the Request for the Operative Documents**

In response to Mr. Ringel's request for all the relevant, operative documents, Pfeiffer did not provide anything until 4 p.m. on the next day, June 26, 2019.  (Ringel Decl. ¶ 12.)  The Firm received by email two (2) documents, an operating agreement for Pulaski and a notice of sale from "Fraidy," someone who appeared to work for Pfeiffer.  (*Id.*)  Lori Schwartz, a partner of the Firm, responded to "Fraidy" at 4:14 p.m.:

> The operating agreement and EIN are for an entity named:   175 Pulaski RLM LLC.
>
> The notice of sale does not name this entity [175 Pulaski RLM LLC] but was delivered to 4218 Partners LLC.  The sale notice also references prior notices and attachments.  Please send all of them with attachments for our review.
>
> Which entity owns the collateral? [A]re these entities related?

(*Id.* Ex. B.)  No further documentation about this matter or communication responsive to her query about who Pulaski was or if it was related to 4218 was ever received.

On July 1, 2019, Mr. Ringel wrote to Pfeiffer that since he had not heard from him he assumed he had obtained a TRO, but he nevertheless sought confirmation.  (Ringel Decl. ¶ 13 Ex. C.)  In response, Flam informed Mr. Ringel that the "UCC sale [was] adjourned last minute to 7/16 (we suspect they [the lender] were hoping to buy time to oppose the TRO)."  (*Id.*)  Flam continued that "the transfer of the membership certificates have been effectuated and a UCC-1 perfecting buyer's interest has already been filed."  (*Id.*)  The fact that Pfeiffer had transferred his

membership interests, according to his lawyer, reinforced Mr. Ringel's opinion that without a full review of the operative agreements, he would not be able to advise as to which entity or entities needed to file for bankruptcy.  (*Id.* ¶ 13.)  Flam stated he would be filing a TRO the following week, but he never disclosed the person or entity to whom the membership interests had been transferred.  (*Id.* ¶ 13 Ex. C.)

Later that same day, Mr. Ringel informed Flam he would be out of the country on July 16, but that Ms. Schwartz would be available as necessary.  (Ringel Decl. ¶ 14 & Ex. C.)  Eleven days later, on July 12, 2019, Flam informed responded that the sale had been adjourned to July 22, 2019.  (*Id.*)  Neither Flam nor Pfeiffer ever provided anything other than the two unhelpful documents they sent to Ms. Schwartz.  (*Id.*)

## C.        The TRO Is Denied

On July 19, 2019, Pulaski and Debtor filed a combined Verified Complaint and Article 75 Petition (the "Complaint") in a proceeding entitled *175 Pulaski RLM et al. v. Maguire Ft. Hamilton LLC* in New York Supreme Court (the "State Court Action").  (Ringel Decl. ¶ 15 Ex. D.)  This submission contained the alleged factual basis upon which the TRO was sought in order to enjoin the sale of the membership interests.  (*Id.*)  Mr. Ringel was not consulted about the contents of this submission, nor did he review the submission before it was filed.  (*Id.*)  Between July 13 and July 22, 2019, he was on a cruise ship in the Caribbean, and first saw the Complaint in January 2020.  (*Id.*)

After reviewing the Complaint, Mr. Ringel learned it alleged that Debtor was the owner of a property known as 4218 Fort Hamilton Parkway, Brooklyn, New York (the "Property") and Pulaski held the entirety of the membership interests in Debtor.  (*Id.* Ex. D ¶¶ 2-3.)  The Complaint set forth that Debtor purchased the Property on November 19, 2018, and that

Maguire's predecessor-in-interest, Ice Lender XVII LLC ("ICE"), provided partial financing for the purchase. (*Id*. ¶ 4.) The Complaint also explained that Fischman had provided Pfeiffer with a loan in the amount of $1,250,000. (*Id*. ¶ 33.) To ensure prompt repayment, Fischman required that Pfeiffer confess judgment in the amount of the loan. Fischman was previously owed $2,000,000 for flipping the sales contract to the Property to Debtor. (*Id*.) With a total amount owed of $3,250,000, Fischman required that Pfeiffer and his wife Dina Krausz transfer to him the entirety of their membership interests in Debtor. (*Id*. Ex. D ¶ 34.) The Complaint alleged that, prior to purchasing the membership interests in Debtor, Fischman ran a UCC-1 search which confirmed his purchase would not be subject to a superior claim. (*Id*. ¶ 39.)

Importantly, the Complaint pinpoints the date of the transfer of the interests as June 26, less than a day after Mr. Ringel spoke to Pfeiffer on June 25:

> On June 26, 2019 after Fischman received the UCC-1 search results, Pfeiffer and Krausz sold the entirety of all 4218 membership interests to Fischman. In consideration, Fischman promised to forbear from executing on the Confession or from collecting on his $2,000,000 fee until after completion of the Properties' development. On June 28, 2019, Fischman's interests in 4218 were filed as part of a UCC-1 financing statement. *See* Assignments to Fischman and corresponding UCC-1 Filings, annexed hereto as Exhibit M.

(*Id*. ¶ 40.) Although the Complaint purported to attach "assignments to Fischman" and UCC-1 financing statements evidencing the existence of a secured interest in favor of Pulaski, the electronic case file on New York State's electronic filing system (NYSCEF) did not contain any assignments and only the UCC-1 for Krausz's transfer. (Ringel Decl. ¶ 17.) Recently, the Firm obtained certified copies of both Pfeiffer and Krausz's UCC-1 filings. (*Id*. Ex. E.)

The basis for the TRO was that Debtor allegedly executed the loan documents with ICE only under economic duress and that, as a result, Maguire's public sale of the membership

interests had to be enjoined.  (Ringel Decl. ¶ 18.)  Pfeiffer admitted, in his affirmation supporting

the TRO application, all of the foregoing facts regarding the genesis of his interest and the

transfer to Pulaski.  (*Id.*  Ex. F, at ¶¶ 12-18.)  This was more information than he ever provided to

Mr. Ringel.   (Ringel Decl. ¶ 18.)

On July 19, 2019, the State Supreme Court denied the emergency application for a TRO

and put the motion on for a hearing on July 31, 2019, after the date of the scheduled sale on July

22, 2019.  (Ringel Decl. ¶ 19 Ex. G.)

**D.     The Firm Formally Declines the Representation**

On Friday, July 19, at 6:03 p.m., Mr. Ringel received an email from Flam which

informed him that the TRO had just been denied, but that "Shabsi [Pfeiffer] wants to file

bankruptcy" in light of the UCC sale being set for Monday morning, July 22, 2019.  (Ringel

Decl. ¶ 20 Ex. H.)   From the middle of the Atlantic Ocean, Mr. Ringel responded almost

immediately at 6:35 p.m.:

> I assume that you are not serious.  It was more than three weeks
> ago that I asked Pfeiffer to send the relevant information for
> preparation of the petition to my partner Lori Schwartz, who [I]
> have copied on this email, so that we could have all the papers
> prepared in advance and ready to go on a moment's notice.  I asked
> him to do this knowing that I would be out of the country until July
> 22.  I also asked to have an engagement letter executed and a
> retainer wired to my firm to be held in escrow so that payment of
> our fee would not be a problem.  We got some information sent to
> us and Lori reached out to Pfeiffer for additional information and
> clarification with respect to what we were sent and never received
> a response.  In addition, the client never signed an engagement
> letter and never wired a retainer.  Now after 6 p.m. on a Friday
> evening when he needs to file on a Monday morning he is reaching
> out to do exactly what we had counseled him against, trying to file
> a bankruptcy petition at the last minute when we have not prepared
> anything in advance.

(*Id.*)  Mr. Ringel stated that while it was possible to prepare a petition over a weekend, it was not possible to prepare it without the relevant information, without having reviewed the relevant documents, and without having received a retainer in advance.  (*Id.*)  Flam admitted that Pfeiffer had put him in a similar position with regard to the payment of his retainer on the TRO application.  (*Id.*)

Later that same night, Mr. Ringel informed Pfeiffer in unambiguous language that the Firm would not be representing him:  "Unfortunately, we will not be in a position to be engaged with respect to this matter on such short notice and proceed with a chapter 11 filing on Monday as you have requested and suggest you make alternative arrangements."  (Ringel Decl. ¶ 21 Ex. I.)  The email explained:

> There are simply too many obstacles to overcome at this time including, but not limited to, a lack of basic information, insufficient time to properly review documents, a lack of a list of creditors and other information needed to complete a Chapter 11 petition, as well as a signed engagement letter and payment of good funds for a chapter 11 retainer.

(*Id.*)

The next night, Flam sent Mr. Ringel an email with attachments containing information that he described as being material covered by the work-product privilege which would be relevant to the filing of a bankruptcy petition.  (Ringel Decl. ¶ 22 Ex. J.)  Mr.  Ringel did not open the attachments.  (Ringel Decl. ¶ 22.)  Within half an hour of receiving the email, he reiterated to Flam what he had already told Pfeiffer that the Firm was not going to handle the matter for Pfeiffer, that it had never been engaged to do so, and that alternative arrangements would have to be made.  (*Id.* Ex. J.)  Flam responded, "Ok" and requested that Mr. Ringel not open the link (which he never did) and delete it from the Firm's or his records (which he did do). (Ringel Decl. ¶ 22.)  A few minutes later Mr. Ringel forwarded to Flam his previous email to

Pfeiffer rejecting the representation.  (*Id.* Ex. K.)  Flam then asked Mr. Ringel for a bankruptcy

lawyer recommendation and Mr. Ringel never heard from Pfeiffer or Flam again.  (*Id.*)

**ARGUMENT**

## I.     LEGAL STANDARD FOR DISQUALIFICATION MOTIONS.

Federal courts discretionary power to disqualify attorneys for ethical violations "derives

from their inherent power to preserve the integrity of the adversary process."  *Hempstead Video,*

*Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005); *see also United States v.*

*Hammad*, 858 F.2d 834, 837 (2d Cir. 1988) (stating that "[t]he federal courts enforce

professional responsibility standards pursuant to their general supervisory authority over

members of the bar").  "In exercising this power, the Court must be solicitous of a client's right

freely to choose his counsel—a right which of course must be balanced against the need to

maintain the highest standards of the profession."  *Bacote v. Riverbay Corp.*, 2017 WL 945103,

at *5 (S.D.N.Y. Mar. 10, 2017) (internal citation and quotation marks omitted).  Thus, courts

should only disqualify an attorney or its law firm where "an attorney's conduct tends to taint the

underlying trial, because federal and state disciplinary mechanisms suffice for other ethical

violations."  *Id.* (internal citation and quotation marks omitted).  Courts considering

disqualification motions "often benefit from guidance offered by . . . state disciplinary rules,

[but] such rules merely provide general guidance and not every violation of a disciplinary rule

will necessarily lead to disqualification."  *Hempstead Video, Inc.*, 409 F.3d at 132 (internal

citations omitted).

While the Court has discretion to disqualify attorneys for unethical conduct, motions to

disqualify are disfavored within the Second Circuit.  *See Lankler, Siffert & Wohl LLP v. Rossi*,

125 Fed. Appx. 371, 372 (2d Cir. 2005) ("[w]e have made it clear that motions to disqualify are

disfavored").  Because such motions are disfavored, the party seeking disqualification "must

carry a heavy burden . . . and meet a high standard of proof before a lawyer is disqualified"; the

burden is not satisfied by "[m]ere speculation."  *Twin Labs., Inc. v. Weider Health & Fitness*,

No. 87 CV 0949, 1989 WL 49368, at *4 (S.D.N.Y. May 4, 1989); *Muriel Siebert & Co., Inc. v.

Intuit Inc.*, 32 A.D.3d 284, 286 (1st Dep't 2006) ("A party seeking disqualification based on the

disclosure of confidential information previously made to the attorney, . . . has the burden of

identifying *specific confidential information* imparted to the attorney."  (internal quotations and

citations omitted) (emphasis added).

    Further, the "[m]ere appearance of impropriety will not alone serve as a sufficient basis

for granting a disqualification motion.  Rather, the motion will be granted only if the facts

present a real risk that the trial will be tainted."[2]  *Revise Clothing, Inc. v. Joe's Jeans Subsidiary,

Inc.*, 687 F. Supp. 2d 381, 388 (S.D.N.Y. 2010) (quoting *United States Football League v.

N.F.L.*, 605 F. Supp. 1448, 1452 (S.D.N.Y. 1985)); *see also Twin Labs., Inc.*, 1989 WL 49368, at

*4 ("[T]he evidence must at least be sufficient to support a reasonable inference that [a canon of

professional responsibility] ha[s] been violated.").

    Because disqualification motions are often used to obtain a tactical advantage, such

motions are "properly subject to careful judicial scrutiny."  *Wertheimer v. Cohen*, 1991 U.S.

Dist. LEXIS 5273, at *3 (S.D.N.Y. Apr. 22, 1991) (citing *Bd. of Educ. v. Nyquist*, 590 F.2d

1241, 1246 (2d Cir. 1979) & *Lamborn v. Ditter*, 873 F.2d 522, 531 (2d Cir. 1989)).  Recently,

the Southern District of New York summarized the problematic nature of motions to disqualify:

> Motions to disqualify are disfavored and subject to a high standard
> of proof.  That is because disqualification impinges on a party's
> rights to employ the counsel of its choice, because a motion to
> disqualify has potential to be used for tactical purposes, and

---

[2]    Debtor argues in the Motion that the "appearance of impropriety" alone, while rare, is another basis to disqualify the Firm from its representation of Maguire (Mot. ¶¶ 44-46), but caselaw clearly demonstrates it is not.

because, even when brought in good faith, such a motion can cause delay, impose expenses, and interfere with the attorney client relationship.

*First NBC Bank v. Murex, LLC*, 2017 U.S. Dist. LEXIS 64727, at *42 (S.D.N.Y. Apr. 28, 2017).  The Motion fails to meet the high standard of proof demanded, is highly prejudicial to Maguire (which freely chose the Firm to represent it and already filed an objection to another frivolous motion filed by Debtor), and should be rejected as a naked and meritless litigation tactic.

## II.    THE MOTION MUST BE DENIED BECAUSE THE FIRM DID NOT VIOLATE THE PROSPECTIVE CLIENT RULE.

Because the Firm's initial consultation with Pfeiffer did not create an attorney-client relationship and the Firm ultimately declined to represent Pfeiffer, the Motion must be analyzed under Rule 1.18 of the New York Rules of Professional Conduct, which governs the relationship between attorneys and prospective clients.  The rule provides, in pertinent part, as follows:

> (a) A person who discusses with a lawyer the possibility of forming a client-lawyer relationship with respect to a matter is a "prospective client."
>
> (b) Even when no client-lawyer relationship ensues, a lawyer who has had discussions with a prospective client shall not use or reveal information learned in the consultation, except as Rule 1.9 would permit with respect to information of a former client.
>
> (c) A lawyer subject to paragraph (b) shall not represent a client with interests *materially adverse* to those of a prospective client in the same or a substantially related matter if the lawyer received information from the prospective client that could be significantly harmful to that person in the matter, except as provided in paragraph (d).

N.Y. Comp. Codes R. & Regs. tit. 22, § 1200 (effective Apr. 1, 2009).  Disqualification is appropriate "only if it is shown that the [confidential] information related in the consultation 'could be significantly harmful' to him or her in the same or a substantially related matter."

*Mayers v. Stone Castle Partners, LLC*, 126 A.D.3d 1, 7 (1st Dep't 2015) (emphasis added) (citations omitted); *see also* N.Y. St. Bar Ass'n Comm. on Prof. Ethics Op. 960 (2013).[3]  As discussed below, Debtor has not discharged its "heavy burden" (*see* Section I, *supra*) of demonstrating that the Firm and Mr. Ringel violated the prospective client rule; indeed, Debtor does not even bother to cite the rule, much less analyze its elements.

Specifically, Debtor has failed to make <u>any</u> showing that the Firm received confidential information from Debtor, nor has Debtor demonstrated that any information the Firm actually received could possibly be construed as "significantly harmful" to Debtor.[4]  It is clear in Rule 1.18 cases that the moving party cannot rely on generalized conclusory allegations contained in vague declarations to meet this burden, which is exactly what Debtor attempts to do here by relying on three declarations that state, in the most general terms, confidential information was disclosed and some sort of attorney-client relationship was formed.   This is not enough. *Pizzarotti, LLC v. FPG Maiden Lane, LLC*, 2019 N.Y. Misc. LEXIS 4841, at *5 (Sup. Ct. N.Y. Cnty. Sept. 3, 2019) (rejecting moving party's unsubstantiated claim that law firm "received information from prospective client . . . that could be significantly harmful" where moving party only offered "vague affidavit . . . to establish that harmful information was disclosed"); *Bernacki v. Bernacki*, 47 Misc. 3d 316, 319 (Sup. Ct. Monroe Cnty. 2015) ("Plaintiff's reference to the information as 'confidential,' without more, is insufficient"); *O Builders & Assocs., Inc. v. Yuna Corp. of N.J.*, 19 A.3d 966, 968-69 (N.J. 2011) (burden of production and burden of persuasion remain on party seeking disqualification); *Coan v. Dunne*, 2019 U.S. Dist. LEXIS 10368, at *20

---

[3]     Rule 1.6(a) of the Rules of Professional Conduct defines confidential information as "information gained during or relating to the representation of a client, whatever its source, that is (a) protected by the attorney-client privilege, (b) likely to be embarrassing or detrimental to the client if disclosed, or (c) information that the client has requested be kept confidential." 22 N.Y.C.R.R. § 1200.00.

[4]     Notably, Maguire's current motion for judgment on the pleadings does not depend on any factual information other than what is alleged in the pleadings and thus does not rely on any content from the alleged discussions between Mr. Ringel and Pfeiffer (or Flam).

(D. Conn. Jan. 22, 2019) ("Defendants allege a one-time meeting between a consultant for Kililea and AMOSS Solicitors, but they do not carry their burden to show confidential information that was actually disclosed and that could be significantly harmful to them if used or disclosed by AMOSS in subsequent proceedings." (applying Conn. R. Prof. Cond. R. 1.18(c)); *cf. Interpetrol Bermuda, Ld. v. Rosenwasser*, 1988 U.S. Dist. Lexis 14307, at * 6-7 (S.D.N.Y. Dec. 19, 1988) (movant's burden to demonstrate that information was both privileged and confidential, "i.e., that it was information not already available to. . .[the lawyer's firm] in January 1988 when the firm was retained," is a "substantial burden []clearly not met by bald, conclusory allegations of confidentiality and prejudice," and "in a pre-retention situation. . .this failure of proof is necessarily fatal to the disqualification motion" (internal citations omitted)).[5]

A closer look at the accompanying declarations submitted in support of the Motion shows Debtor has not met either his burden of production or persuasion, instead simply stating in the most conclusory fashion that it "disclosed confidential information" (Mot. ¶ 33).   Pfeiffer's declaration devotes only *four* small paragraphs to the entirety of his purported confidential "discussions" with Mr. Ringel and the Firm.  (Decl. of Samuel Pfeiffer dated February 14, 2020 (hereinafter, "Pfeiffer Decl.") [Dkt. No. 61-3] ¶¶ 11, 14-16.)  In relevant part, he states:  (1) he held a telephone conference with Mr. Ringel (which was only 26 minutes long) where he discussed (a) "litigation strategy to prevent the U.C.C. sale of the membership interests in the Debtor and whether a bankruptcy proceeding would be effective as a back-up plan" and (b) "the desirability of transferring the membership interests in the Debtor from our individual names to a corporate entity preparatory to a bankruptcy filing."  (*Id.* ¶ 11; *see also* Decl. of Flam dated Feb.

---

[5]    *See also Gustafson v. Dippert*, 68 A.D.3d 1678, 1679 (4th Dep't 2009) ("slim evidence and generalized allegations" are insufficient to justify disqualification.); *Sullivan v. Cangelosi*, 84 A.D.3d 1486, 1487 (3d Dep't 2011) ("Defendant failed to establish that he shared any information with Carroll during the telephone conversation that could be considered confidential.")

13, 2020 (hereinafter, "Flam Decl.") [Dkt. No. 61-2], ¶ 5 (tracking *the same language*).)  Pfeiffer

also claimed to "recall discussing, in the course of several conversations with Ringel between

June 25, 2019 and July 20, 2019, the details of litigation strategy to prevent Maguire from selling

the membership interests in the Debtor, including asserting the claim that the loan and security

documents had been executed . . . under economic duress" and Ringel asking him what the "end

game" of a bankruptcy filing would be, to which Pfeiffer purportedly responded with

background facts concerning his dealings with Maguire's predecessor lender, ICE.   (Pfeiffer

Decl. ¶ 15; *see also* Mot. ¶ 17.)[6]

These statements also fail to mention that (i) most of that call related to the information

Robinson Brog required in order to evaluate whether it could take on a representation and the

terms of retaining the Firm, (ii) Pfeiffer never provided any of the requested information, and

(iii) the only other "discussion" Mr. Ringel had with Pfeiffer, aside from the initial call, was the

one in which he declined the representation because Pfeiffer failed to provide the requested

information and waited until the very last minute, on a Friday night, to attempt to engage the

Firm for a bankruptcy filing, knowing Mr. Ringel was literally at sea and the filing needed to be

made Monday morning.  Even accepting the allegations in the Motion's supporting declarations

(without considering Mr. Ringel's more detailed declaration that is supported by documentation),

Debtor's generalized statements are so palpably threadbare and insufficient (because the Firm

received no confidential information) that Debtor has not met its burden to show what they

---

[6]        Flam's declaration is no better.  First, he parrots exactly the same information that Pfeiffer states in his declaration, and then he claims that after the telephone conference he continued to have "several conversations" with Mr. Ringel concerning strategies and their economic duress claim (Flam Decl. ¶ 7), but he provides absolute no documentation to support this claim – no phone records or emails.  As the Court can see in the emails provided by Mr. Ringel with his declaration, those communications related to the fact that Pfeiffer did not provide any information that would allow the Firm to evaluate a representation and they clearly show no discussion of legal advice or strategy.  (*See* Ringel Decl. Exs. B, C, H-K.)  Fischman's declaration is even more flimsy, as he was an undisclosed principal of Debtor's who was never even mentioned to Mr. Ringel, on the call or afterwards.

disclosed was significantly harmful to Debtor or how any of this consultation gave Maguire an advantage in the Adversary Proceeding or bankruptcy generally.

By contrast, Mr. Ringel's declaration, supported by emails and other material, explains that the vast-majority of the 26-minute call between Mr. Ringel and Pfeiffer involved a generic discussion with the Firm explaining to Pfeiffer (not Debtor) (i) the need for a retainer, (ii) the funding of a retainer (which Pfeiffer contested rather than agreeing to pay), and (iii) the basic information and documents the Firm required to evaluate whether it would undertake the representation.  (Ringel Decl. ¶¶ 6-11.)  None of that involved confidential information, legal strategy, or legal advice; it was information the Firm requires any prospective client to provide who is inquiring about representation.

Mr. Ringel, however, never discussed with Flam or Pfeiffer any economic duress claim or the purported "end game" at all.  (Ringel Decl. ¶¶ 6-11, 32-33.)  Pfeiffer and Flam claimed that they discussed with Mr. Ringel the possible strategies to prevent Maguire from selling the membership interests, including their economic duress claim, but the email communications between Flam and Mr. Ringel show that Mr. Ringel never had the information required to have those types of discussions.  (Ringel Decl. ¶¶ 12-22 & Exs. B, C, H-K.)  They show Mr. Ringel rejecting the representation for that very reason, among others.  Pfeiffer did not even disclose even the most basic information, such as the name of Debtor (i.e., the holder of the Membership Interests), the name of the bank that provided the loan, or the location of the property at issue. (Ringel Decl. ¶ 6.)

The only thing discussed was what the Firm required for any bankruptcy filing and the background fact information that Pfeiffer was first pursuing a state court action to seek the TRO relating to his membership interest.  This background information concerning a separate state

court action was not confidential (i.e., embarrassing or detrimental to Pfeiffer (or Debtor) within the meaning of Rule 1.6(a)) or privileged.  Quite the opposite:  this information was <u>disclosed</u> as part of the publicly-filed action Pfeiffer brought in state court, and it was not then and is not now significantly harmful to Debtor now.  *See Xiao Hong Liu v. VMC East Coast LLC*, 2017 WL 4564744 (E.D.N.Y. Oct. 11, 2017) (information is not significantly harmful "if it is public information, if it merely regards the history of the dispute or if it is likely to be revealed at the moving party's deposition or in other discovery" (citing *Benevida Foods, LLC v. Advance Magazine Publishers Inc.*, No. 15 CV 2729, 2016 WL 3453342, at *11 (S.D.N.Y. June 15, 2016); *Bell v. Cumberland Cty.*, No. 09 CV 6485, 2012 WL 1900570, at *8 (D.N.J. May 23, 2012)); *Mayers*, 126 A.D.3d at 7-8 ("heavy burden of establishing disclosed confidences not met because "[t]he and the parties' respective pleadings establish that Mayers's plan . . . had been made generally known"); *In re Corwin Place*, LLC, 562 B.R. 663 (Bankr. N.D. W. Va. 2016) (no evidence that information disclosed could be significantly harmful.); *In re Faller*, 2014 WL 3385364 (Bankr. W.D. Ky. 2014) (same).

Equally important, after the call ended, Pfeiffer failed to provide the information the Firm requested (which would have been necessary to provide any legal advice), failed to sign a retainer (indeed, no retainer was ever drafted) or pay any sum to retain the Firm.  When Pfeiffer finally conveyed on Friday, July 19, that he wanted to retain the Firm, on the eve of needing a stay on Monday, July 22, the Firm flatly rejected the prospective representation and told him to seek counsel from another attorney.  (Ringel Decl. ¶ 21.)

In a case with a far richer fact pattern of communication between lawyer and prospective client, the U.S. District Court for the District of New Jersey <u>refused</u> to disqualify the defendant's law firm on the basis of discussions the firm previously had with the plaintiff as a prospective

client.  *See ADP, Inc. v. PMJ Enters., LLC*, 2007 U.S. Dist. LEXIS 17808 (D.N.J. Mar. 14,

2007).  A principal of the plaintiff briefly spoke with Kiel, a partner of the law firm, to represent

the plaintiff in a suit against the defendant.  *Id.* at *1-9.  She explained the nature of the business

and the dispute between the two parties, the factual basis of an anticipatory counterclaim, the

plaintiff's litigation strategy, and the plaintiff's settlement position and strategy.  *Id.*  In other

words, she disclosed far more to Kiel than Debtor claims was disclosed here.  In opposing the

disqualification motion, the potentially conflicted attorney, Kiel, stated he did not recall those

details, particularly regarding settlement strategy.  *Id.* at *3.  Eventually Kiel realized his firm

was already representing the defendant on other matters and that they would continue

representing the defendant while the firm attempted to build an ethic screen around Kiel.  *Id.* at

*8.

Just like this case, *ADP, Inc.* involved Rule 1.18.  Other than finding a prospective client

relationship between the law firm and the plaintiff, the court determined that all the other factors

weighed against granting the motion to disqualify.  In the court's view, discussions regarding the

nature of the business, the history of the dispute, the anticipation of a counterclaim, and, because

settlement had been ongoing between the plaintiff and the defendant, settlement strategy were

not confidential and thus did not constitute significantly harmful information.  *Id.* at *12-16.

Here, this Court should reject the Motion, as Mr. Ringel's discussions were limited and

undetailed in comparison to what was discussed in *ADP, Inc.*  Indeed, it would have been

impossible for Mr. Ringel to have provided any advice since Pfeiffer never provided the most

basic information required for such analysis.

Last, in an astonishing leap divorced of logic or factual support, Debtor appears to argue

that its principal, Mr. Fischman, is a prospective client of the Firm.  (Mot. ¶¶ 13-16 ("[Fischman]

agreed with Pfeiffer and Flam's strategic direction and authorized Pfeiffer and Flam to continued consultations with Ringel on his and Pulaski's behalf."); Decl. of Fischman dated Feb. 13, 2020 ¶ 6 ("Pfeiffer and Flam were authorized by me to consult attorneys and take action to prevent the loss of the membership interests . . . .").)  It also argues that once Pfeiffer assigned his membership interests to Pulaski, after its call with the Firm, that Pulaski became a prospective client.  (Mot. ¶ 39.)  As a factual matter, neither Mr. Fischman nor Pulaski could possibly be a prospective client of the Firm when Pfeiffer <u>never</u> disclosed their names or existence on the June 25 call (or at any time after the call).  The Firm first learned of Pulaski's and Mr. Fischman's involvement in Debtor in this bankruptcy action.  Tellingly, a thorough search of the declarations accompanying the Motion reveals not one mention of any person advising the Firm of Pulaski's or Mr. Fischman's involvement or that Pfeiffer was authorized to speak for Pulaski or Fischman.  The Firm cannot possibly contemplate representing an entity or individual in any matter or litigation when it does not know the identity of the person or entity.  It cannot run a conflict check against its existing client base, evaluate the basic complexities of a representation, or evaluate whether that individual or entity can pay its legal invoices.

In a case that bears similarity to this claim by Debtor, *Pellegrino v. Oppenheimer & Co.*, 49 A.D.3d 94, 99 (1st Dep't 2008), the First Department ruled that "a party cannot create the relationship based on his or her own beliefs or actions," which is exactly what Debtor is trying to do here by claiming Pulaski was a prospective client of the Firm.  The court held that where in-house counsel consulted with a law firm concerning sexual harassment claims against the corporation's general counsel, the law firm was not disqualified from representing  another employee adverse to the corporation and general counsel simply because the firm spoke with a representative of the entity in a preliminary manner.  No attorney-client relationship formed

between the law firm and the in-house counsel, and by extension between the firm and the corporation, under such circumstances. *Id.* Likewise the mere fact that Pfeiffer communicated with Mr. Ringel did not mean *ipso facto* that he had somehow entered into discussions with Pulaski or Fischman as a prospective client. That Fischman allegedly directed Flam and Pfeiffer to act on behalf of Pulaski and himself has no legal force because this information was not disclosed to the Firm or Mr. Ringel. It cannot be used now to create a prospective client relationship between the Firm and either Pulaski or Fischman.

Section 6.03 of the Restatement of Agency, which addresses duties to undisclosed principals makes clear that Debtor cannot unilaterally transform Pulaski or Fischman into a prospective client to whom duties are owed:

> The nature of the performance that a contract requires from a third party determines whether an undisclosed principal is entitled to receive that performance. An undisclosed principal may not require that a third party render performance to the principal if rendering performance to the principal would materially change the nature of the third party's duty, materially increase the burden or risk imposed on the third party, or materially impair the third party's chance of receiving return performance. These limits correspond to the limits imposed on assignment of a contractual right. *See* Restatement Second, Contracts § 317(2).

In the case of Pulaski and Mr. Fischman (the "undisclosed principals"), not only would the Firm have the practical issue of being unable to run a conflict check, but if it intends to represent a developer in a chapter 11 case, it is critically important to know the identity of the developer as a potential debtor. The developer's ability to obtain financing, its history successfully constructing buildings and completing developments, and its creditworthiness are all key issues the Firm must consider in deciding whether it is interested in acting as counsel. Since the Firm cannot gauge any of those criteria for an undisclosed principal (Fischman), the potential attorney-client relationship would <u>materially change</u> based upon the identity of the client as would the burdens

and risks of there being a successful chapter 11 case (as well as the desirability of taking on the work and the prospects of being compensated).

With respect to Debtor's claim that Pulaski is a prospective client based on Pfeiffer's transfer of his membership interests to Pulaski, such an argument is no less availing and is without legal support.  Maguire has not identified, and Debtor has not cited, <u>any</u> case standing for the proposition that a prospective client's assignment of its membership interests to a different entity not only transfers the interests, but also the prospective client's legal representation.  Lawyers cannot be conscripted into future representations by the assignment whims of those they currently represent (or, even more tenuously, those they consider representing, like Pfeiffer).  That is not how ethical rules function and it is no surprise Debtor supplies no caselaw to support that position.  Accordingly, the Motion's argument that the Firm represents Mr. Fischman holds absolutely no water and should be summarily rejected.[7]

The Motion amounts to unsupportable conclusions of law that are unmoored by the facts in this case.  No representation ever commenced and no confidences were ever shared.  It is obvious the only thing Debtor views as "significantly harmful," which motivated filing the Motion, is having competent counsel representing Maguire in the Adversary Proceeding.  This is not a basis to disqualify and the Court should reject it.

---

[7]      As an alternative ground for denying the disqualification motion, a movant's delay in seeking disqualification results in prejudice to the opposing party.  *See In re WorldCom, Inc.*, 311 B.R. 151, 166-67 (Bankr. S.D.N.Y. 2004) ("[a]n unjustified delay in bringing a motion to disqualify provides a separate ground to deny the relief requested in the underlying motion"); *Brown & Williamson Tobacco Corp. v. Pataki*, 152 F. Supp. 2d 276, 290 (S.D.N.Y. 2001) ("[Movant] must have made a tactical decision at the outset not to seek what it regards as obviously-required disqualification . . . .  Having made that choice, it must accept the consequence now and acknowledge the prejudice to [non-movant] of permitting [non-movant's counsel] to participate in the action."); *Universal City Studios, Inc. v. Reimerdes*, 98 F. Supp. 2d 449, 456 (S.D.N.Y. 2000) (denying disqualification motion when the movant failed to act within just <u>one month</u> of gaining knowledge of an apparent conflict, even where the opposing counsel's ethical breach was blatant).  The timing of the Motion, three weeks after Maguire's counsel entered a notice of appearance and two weeks after Maguire filed a notice of motion for judgment on the pleadings and a stay of discovery, seeking dismissal of the Adversary Proceeding, points to pure gamesmanship and tactical use of a disqualification motion.  (Ringel Decl. ¶¶ 34-35.)  The Court should reject this tactic.

### III.   DEBTOR CANNOT SATISFY THE SECOND CIRCUIT STANDARD FOR DISQUALIFICATION OF COUNSEL UPON WHICH IT RELIES.

Although Debtor never identified the ethical rules on which it relies (rules governing former clients vs. prospective clients), it cited the "classic" Second Circuit test for the Motion and its (limited) analysis appears to flow from it:

> (1) the moving party is a former client of the adverse party's counsel; (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and (3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior relationship.

*United States v. Prevezon Holdings Ltd.*, 839 F.3d 227, 239 (2d Cir. 2016) (citing *Evans v. Artek Sys. Corp.*, 715 F.2d 788 (2d Cir. 1983)).   Under this test, however, the Motion should be rejected outright because it does not meet <u>any</u> of the elements cited therein.

#### A.   Neither Debtor nor Pfeiffer Is the Firm's Former Client.

First and foremost, the Motion fails because it cannot meet the first element of the *Evans* test:  neither Debtor nor Pfeiffer is a former client of the Firm.  New York courts have generally relied on several factors to determine whether an attorney-client relationship exists:

> 1) whether a fee arrangement was entered into or a fee paid; 2) whether a written contract or retainer agreement exists indicating that the attorney accepted representation; 3) whether there was an informal relationship whereby the attorney performed legal services gratuitously; 4) whether the attorney actually represented the individual in one aspect of the matter (e.g., at a deposition); 5) whether the attorney excluded the individual from some aspect of a litigation in order to protect another (or a) client's interest; 6) whether the purported client believes that the attorney was representing him and whether this belief is reasonable.

*Med. Diagnostic Imaging PLLC v. CareCore Nat'l LLC*, 542 F. Supp. 2d 296, 307 (S.D.N.Y. 2008) (internal quotations omitted).   These factors demand the inevitable conclusion that no attorney-client relationship existed between the Firm and either Debtor or Pfeiffer.

As discussed in the Ringel Declaration, there was no agreed-upon fee arrangement, no retainer agreement provided to or signed by Pfeiffer (and Pfeiffer did not attempt to provide one in support of his flimsy motion), no legal work, informal, gratuitously, or otherwise, performed, and the Firm never undertook to act on Pfeiffer's behalf at any time.   (Ringel Decl. ¶ 25.) Everything in the Motion conveniently turns on a 26-minute call where Mr. Ringel discussed what he would require in order to undertake a representation.   No confidences were exchanged on that call – only Pfeiffer's announced intention to save the sale of his membership interests (which he assigned to an entity unknown to Mr. Ringel the very next day) by seeking injunctive relief in state court.   That is information he since disclosed in his state court action, is unrelated to the issues in the Adversary Proceeding (as he is not Debtor and has no interest in Debtor), and certainly not the basis for establishing any relationship between the Firm and Debtor or Pfeiffer. No other client confidences were disclosed that might suggest any reasonable belief that the Firm was representing him.   It is especially obvious no confidences were exchanged when Pfeiffer did not even identify the entity that might be filing for bankruptcy protection or put Mr. Ringel in touch with a representative of the entity (in this case, Mr. Fischman).[8]  Further, when nearly a month later Pfeiffer finally requested the Firm represent him, it declined to do so and expressly set forth the reasons in a writing provided to this Court.   (Ringel Decl. ¶¶ 20-24.)  Neither Debtor nor Pfeiffer can seriously claim they are a former client.

---

[8]      It comes as no surprise, then, that Debtor attempts argue that, under *Prevezon*, there is an "irrebuttable presumption" that confidences were provided to the Firm.  (Mot. ¶ 36.)  The problem for Debtor, however, is that it is not a former client entitled to rely on *Prevezon* and, as discussed below, there is no "substantial relationship between Pfeiffer's attempt to save his membership interests in state court and the bankruptcy filing of Debtor, which is not owned in any respect by Pfeiffer.

Add to that *Prevezon Holdings Ltd.*, 839 F.3d 227, the principal (and really the only) case relied on by Debtor for its arguments, is inapposite to the factual circumstances at issue here. Unlike this case, the parties in *Prevezon Holdings Ltd* <u>never disputed</u> that the moving party, Hermitage Capital Management ("Hermitage"), was a former client. The court detailed BakerHostetler's prior representation of Hermitage: it had received a signed retainer agreement, acted as counsel for nine months as part of an investigation into fraud against Hermitage, had reviewed non-public documents, created a case timeline and chronology, discussed potential individuals for depositions, met with government prosecutors, drafted a twenty-five page declaration recounting how Hermitage had been the victim of a treasury fraud in Russia, and received over $200,000 in legal fees. *Id.* at 231-32. These are the same sort of facts that fit neatly into the *Med. Diagnostic Imaging PLLC* factors but are absent in this case. Had the *Prevezon* Court been faced with the fact pattern at issue here, where Pfeiffer, a non-party with no interest in Debtor who was never a former client of the Firm's made the Motion, it undoubtedly would have found the absence of an attorney-client relationship and gone no further in its analysis.

### B. There Is No Substantial Relationship between What Pfeiffer Discussed with the Firm and the Issues in the Adversary Proceeding.

Second, although it is clear there was no "prior representation" of Debtor required under the second element of the *Evans* test, nothing Pfeiffer communicated to the Firm has a substantial relationship to the issues present in the Adversary Proceeding. The communications between the Firm and Pfeiffer were limited to the costs of the Firm's retention and the basic information the Firm would need to evaluate a potential bankruptcy. Pfeiffer did not disclose the name of the entity that would be filing (or the identity of that entity's principal) and did not disclose his plan to transfer his membership interests to that entity. Pfeiffer merely stated his

now-publicly-disclosed plan to seek a TRO to protect his membership interest in state court. Nothing communicated by Pfeiffer relates in <u>any</u> way to the current posture of the Adversary Proceeding such that the Firm could reasonably be disqualified from representing Maguire. Indeed, Pfeiffer, who on February 14, 2020, filed a motion to join [Dkt. No. 62], holds <u>no</u> interest in Debtor and is not a part of the Adversary Proceeding.[9]

By contrast, in *Prevezon*, after Hermitage terminated its relationship with BakerHostetler, BakerHostetler began defending Prevezon in a criminal action in which Prevezon was being prosecuted for being part of the money laundering operation that had *victimized Hermitage*. Effectively, the question before the court was whether BakerHostetler's representation of Prevezon in a criminal action was "substantially related" to its prior <u>undisputed</u>, long-term representation of Hermitage when Hermitage was not a party to the action and whether it had access to privileged information in the course of that relationship. *Id.* 231-1. The court concluded that there was a substantial relation because (i) Hermitage was the "putative victim" and (ii) part of BakerHostetler's trial strategy was to blame Hermitage for the underlying fraud that led to the money laundering. *Id.* Here, there is simply no plausible basis to find a substantial relationship between a non-confidential communication relating to a state court legal maneuver by a person who holds no interest in Debtor and the bankruptcy issues facing Debtor here.

---

[9]    Pfeiffer's decision to submit a joinder (the "Joinder") to the disqualification motion made by 4218 and Pulaski corroborates the factual description set forth in the Ringel Declaration regarding the nature of the June 25 telephone call. Pfeiffer's individual counsel in the Joinder recognizes that Pfeiffer is, of course, a "non-party" to this case and the Adversary Proceeding because he (and his wife) transferred their membership interests in 4218 to Pulaski (Fischman) on June 26, 2019, and, therefore, on the date the petition was filed, Pfeiffer was divested of any membership interest in Debtor which owned the Property. However, when Pfeiffer contacted Mr. Ringel on June 25, 2019, Pfeiffer was, in fact, a directly interested "party" who was seeking to retain counsel to prevent the sale of *his* interest. In other words, the Joinder acknowledges, in contrast to the declaration submitted by Debtor through its counsel, Mr. Nutovic, that Pfeiffer's transfer to Pulaski cannot be glossed over as if Pulaski, 4218, Fischman, and Pfeiffer were all one entity (which had never been disclosed to Mr. Ringel), but rather that the transfer mandated a separate joinder by a non-party (Pfeiffer) that is fully consistent with Mr. Ringel's statements that Pfeiffer was seeking counsel on June 25 to protect his own interests.

### C.    The Firm Is Not in Possession of Any Privileged Information.

Third, disqualification is not appropriate here because the Firm did not have access to, nor was it likely to have had access to, relevant privileged information in the course of its limited interaction with Pfeiffer.  This element has been thoroughly discussed above and it is clear that the Firm is not in possession of any privileged information from Pfeiffer.  Pfeiffer sent Lori Schwartz the operating agreement for Pulaski (Ringel Decl. ¶ 12), but this document is neither privileged nor even confidential.  Further, after the Firm clearly advised Pfeiffer and Flam it would not represent Pfeiffer in any potential bankruptcy action, Flam sent the Firm documents that the Firm never opened and promptly deleted.  (Ringel Decl. ¶ 22.)  It did not review any confidential or privileged information in the course of its discussion with Pfeiffer, relevant or otherwise.  Accordingly, there is no basis for claiming that this element of *Evans* is met.

## CONCLUSION

Respectfully, for all of the foregoing reasons, this Court should deny the Motion in its entirety and grant such further and other relief as it deems just and proper.

Dated:  New York, New York          ROBINSON BROG LEINWAND GREENE
      February 21, 2020            GENOVESE & GLUCK P.C.

By:  /s/ Fred B. Ringel
      Fred B. Ringel, Esq.
      William A. Rome, Esq.
      Lori Schwartz, Esq.

875 Third Avenue, 9th Floor
New York, New York 10022
Telephone:    (212) 603-6300
Facsimile:    (212) 956-2164

*Attorneys for Defendant Maguire Ft. Hamilton LLC*